UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

LATERAL RECOVERY LLC, BENCHMARK
BUILDERS, INC., FTE NETWORKS, INC.,
JUS-COM LLC and FOCUS WIRELESS, LLC,

                    Plaintiffs,

     v.

HFH CAPITAL LLC d/b/a HFH CAP, HFH
CAPITAL FUNDING LLC d/b/a HFH CAP,
ISRAEL WASSERMAN, and JOHN AND
JANE DOE INVESTORS,

                    Defendants.

          Civ. A. No.: 1:22-cv-10414

---

## COMPLAINT

     Plaintiffs Lateral Recovery LLC ("Lateral"), Benchmark Builders, Inc. ("Benchmark"), FTE Networks, Inc. ("FTE Networks"), Jus-Com LLC ("Jus-Com") And Focus Wireless, LLC ("Focus") (collectively "FTE") as and for their Complaint against HFH Capital LLC ("HFH Capital"), HFH Capital Funding LLC ("HFH Funding"), (HFH Capital and HFH Funding collectively the "MCA Company"), Israel Wasserman ("Wasserman")(HFH Capital, HFH Funding, and Wasserman collectively referred to as the "Principal"), and John and Jane Doe Investors (the "Investors" together with the MCA Company and the Principal, collectively, the "Defendants" or the "Enterprise"), state as follows:

## NATURE OF THE ACTION

     1.    This is a RICO action against a merchant cash advance ("MCA") company that is controlled and manipulated by its CEO and founder, Wasserman, to carry out a long-running scheme to collect upon unlawful debts and otherwise fraudulently obtain funds from FTE. HFH

Capital and HFH Funding entered the so-called "Merchant Agreements" with FTE pursuant to which lump sums were purportedly paid to purchase FTE's future receipts at a discount and FTE agreed to repay the face value of its receipts through daily payments. While couched as the purchase and sale of future receipts, the agreements' terms, conditions, and actions of the Principal demonstrate that despite the form of the agreements (the "MCA Agreements"), no sale of receipts ever took place.

2.     Rather, the MCA Agreements were loans for which Defendants negotiated and demanded repayment within a fixed time period—seventy-three days for the First Loan Transaction, and ninety days for the Second Loan Transaction (as described below).  The payment term and interest charged are the metrics that the Defendants use to dictate the terms of the transactions. And under New York law, intent is the touchstone of whether a transaction is a loan, regardless of what the face of the contract purports it to be. Acknowledging the transactions as the true loan that they are, the loans charged an interest rate that exceeded **249%** and **202%** multiple worlds and universes greater than the maximum 25% permitted under New York Penal Law.

3.     The Defendants are not alone.  Numerous other MCA companies use the same sham MCA agreements as a cover for their loansharking activities.

4.     For instance, the sham nature of Yellowstone Capital LLC's ("Yellowstone") form agreement recently drew scrutiny by New York's highest court. In answering certified questions from this Circuit concerning the procedural remedies available to redress Yellowstone's (also known as CMS) *unlawful* collection activities, a dissenting member of the Court questioned the underlying premise of the questions presented, i.,e., that the underlying judgment was presumed to be a lawful one:

> Although the GTR and CMS agreements are described as 'factoring' agreements, they do not bear several of the hallmarks of traditional factoring arrangements, in

that FutureNet did not sell any identifiable receivable to GTR or CMS; GTR and CMS did not collect any receivables; GTR and CMS received fixed daily withdrawals from FutureNet's bank account regardless of whether or how much FutureNet collected from or billed to its clients; and GTR and CMS did not bear the risk of nonpayment by any specific customer of FutureNet. The arrangements FutureNet entered with GTR and CMS appear less like factoring agreements and more like high-interest loans that might trigger usury concerns (*see Adar Bays, LLC v GeneSYS ID*, — NE3d —, 2021 NY Slip Op 05616 [2021]).

*Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*, 2021 N.Y. LEXIS 2577, *45, 2021 NY Slip Op 07055, 11, 2021 WL 5926893 (N.Y. Dec. 16, 2021) (dissenting opinion).

5.       New York's highest court is not alone. The Attorneys General of both New York and New Jersey each filed separate actions against others using the same sham form of MCA agreement, alleging that the transactions are disguised loans subject to this state's usury laws. **See Exs. 1-2.**

6.       The New Jersey Attorney General's Office ("NJ AG") and the Federal Trade Commission (the "FTC") each filed separate actions against Yellowstone and others, alleging that for years they have engaged in deceptive conduct to conceal the true nature of their transactions with merchants, including the very conduct underlying this action. *See* **Exs. 2-3**, which factual allegations are incorporated herein by reference.

**<u>HFH Cap Umbrella</u>**

7.       Wasserman has been engaging in deceptive and fraudulent conduct through his unlawful loansharking companies—HFH Capital and HFH Funding.

8.       Upon information and belief, HFH Capital and HFH Funding (collectively "HFH Cap") operate under the d/b/a name HFH Cap.

9.       HFH Capital was formed in February 2017. *See* **Ex. 4**.

10.      HFH Funding was formed in March 2017. *See* **Ex. 5.**

11.     Both HFH Capital and HFH Funding were strategically organized under the laws of New York so that they could utilize New York's confession of judgment statute and post-judgment collection devises.

12.      Wasserman is the CEO and founder of "HFH Capital" as further evidenced by its website and his LinkedIn profile.[1] *See* **Ex. 6.**

13.     HFH Funding mirrors the website for HFH Capital.[2]

14.     Upon information and belief, HFH Capital and HFH Funding operate under the HFH Cap umbrella.

15.     Wasserman through HFH Capital and HFH Funding preys upon and targets businesses in need of loans. Plaintiff was one of the Defendants' targets.

16.     Notably, at the time of the transactions with Defendants, FTE, a then publicly traded company, was being victimized by a CEO and CFO who were later indicted for fraud and embezzlement. The Defendants took advantage by effectively robbing FTE's shareholders and its creditors.

17.     It is against this backdrop that Plaintiffs file this Complaint.

## THE PARTIES

18.     FTE Networks was a corporation duly organized under the laws of Nevada with its principal place of business located in Naples, Florida.  It was the sole owner of Benchmark and the sole owner and managing member of Jus-Com and Focus Wireless.

19.     At all times material hereto, Benchmark was a corporation duly organized under the laws of New York with its principal place of business located in New York, New York.

---

[1] https://www.hfhcapital.com/about-us
[2] https://www.hfhcapitalfunding.com/

4

20.     At all times material hereto, Jus-Com was a limited liability company duly organized under the laws of Indiana with its principal place of business in Naples, Florida.

21.     At all times material hereto, Focus was a limited liability company duly organized under the laws of Florida with its principal place of business in Naples, Florida.

22.     At all times material hereto, Lateral was a limited liability company duly organized under the laws of Delaware with its principal place of business in California.

23.     Defendants have been operating HHF Capital since at least February 2017.  *See* Ex. 4.

24.     Defendants have been operating HFH Funding since at lease March 2017. *See* Ex. 5.

25.     HFH Capital LLC is a limited liability company duly organized under the laws of New York with its principal place of business in New York at 6010 New Utrecht Avenue, Brooklyn, New York 11219. Its registered agent is listed as Israel Wasserman.

26.     On June 17, 2022, an assumed name filing was filed with the New York Department of State documenting that it has another assumed name of OHH Funded. *See* Ex. 4.

27.     HHF Capital Funding LLC is a limited liability company duly organized under the laws of New York with its principal place of business in New York at 1677 44th Street, Brooklyn, New York 11204. Its registered agent is listed as Yaakov Waxler.

28.     Wasserman is an individual who resides in New Jersey

29.     Upon information and belief, each of the John and Jane Doe Investors is a citizen of New York or New Jersey.

**<u>JURISDICTION</u>**

30.     This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. §1331 based on Plaintiffs' claims for violations of the Racketeer Influenced and Corruption Organizations Act, 18 U.S. C. §§ 1961–68.

31.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred here.

32.     Each Defendant is subject to the personal jurisdiction of this Court because each Defendant has voluntarily subjected itself/himself/herself to the jurisdiction of this Court; regularly transacts business within the State of New York, and/or has purposefully availed himself of the jurisdiction of this Court for the specific transactions at issue.

## FACTUAL ALLEGATIONS

### A.     The Predatory MCA Industry

33.     As Bloomberg News has reported, the MCA industry is "essentially payday lending for businesses," and "interest rates can exceed 500 percent a year, or 50 to 100 times higher than a bank's."[3]  The MCA industry is a breeding ground for "brokers convicted of stock scams, insider trading, embezzlement, gambling, and dealing ecstasy."[4]  As one of these brokers admitted, the "industry is absolutely crazy. … There's lots of people who've been banned from brokerage. There's no license you need to file for.  It's pretty much unregulated."[5]

---

[3] Zeke Faux and Dune Lawrence, *Is OnDeck Capital the Next Generation of Lender or Boiler Room?*, BLOOMBERG (Nov. 13, 2014, 6:07 AM), https://www.bloomberg.com/news/articles/2014-11-13/ondeck-ipo-shady-brokers-add-risk-in-high-interest-loans.
[4] *Id.*
[5] *Id.*

34.     The National Consumer Law Center also recognized that these lending practices are predatory because they are underwritten based on the ability to collect, rather than the ability of the borrower to repay without going out of business.[6]

35.     This is because MCA companies "receive the bulk of their revenues from the origination process rather than from performance of the loan [and thus] may have weaker incentives to properly ensure long-term affordability, just as pre-2008 mortgage lenders did." *Id*. ("[A] fundamental characteristic of predatory lending is the aggressive marketing of credit to prospective borrowers who simply cannot afford the credit on the terms being offered.  Typically, such credit is underwritten predominantly on the basis of liquidation value of the collateral, without regard to the borrower's ability to service and repay the loan according to its terms absent resorting to that collateral.").

36.     The MCA companies only care about whether they can collect upon default, and not whether the small business can survive.

**B.     The MCA Agreements are Substantively and Procedurally Unconscionable.**

37.     The MCA Agreements entered into by the Plaintiffs, are unconscionable contracts of adhesion that were not negotiated at arms-length.

38.     Instead, they contain one-sided terms that prey upon the desperation of the small businesses and their individual owners and help conceal the fact that the transactions, including these involving FTE, are really loans.

39.     Among these one-sided terms, the MCA Agreements include: (1) a provision giving the MCA company the irrevocable right to withdraw money directly from the merchant's bank

---

[6] https://www.occ.gov/topics/supervision-and-examination/responsible-innovation/comments/comment-nclc-et-al.pdf (last accessed 2/15/22).

accounts, including collecting checks and signing invoices in the merchant's name, (2) a provision preventing the merchant from transferring, (3) moving or selling the business or any assets without permission from the MCA company, (4) a one-sided attorneys' fees provision obligating the merchant to pay the MCA company's attorneys' fees but not the other way around, (5) a venue and choice-of-law provision requiring the merchant to litigate in a foreign jurisdiction under the laws of a foreign jurisdiction, (6) a personal guarantee, the revocation of which is an event of default, (7) a jury trial waiver, (8) a class action waiver, (9) a collateral and security agreement providing a UCC lien over all of the merchant's assets, (10) a prohibition of obtaining financing from other sources, (11) the maintenance of business interruption insurance, (12) a right of access to the merchant's premises and operations in favor of the MCA company, (13) the right to direct all credit card processing payments to the MCA company, (14) a power-of-attorney with full authority "to take any action or execute any instrument or document to settle all obligations due to HFH Cap from Processor, or in the case of violation by Merchant of Section 1, or the occurrence of an Event of Default under Section 3 hereof…"

40.    The MCA Agreements are also unconscionable because they contain numerous knowingly false statements.  Among these knowingly false statements are that: (1) the transaction is not a loan, (2) the daily payment is a good-faith estimate of the merchant's receivables, (3) the fixed daily payment is for the merchant's convenience, (4) that the automated ACH program is labor intensive and is not an automated process, requiring the MCA company to charge an exorbitant Origination Fee and ACH Program Fee.

41.    The MCA Agreements are also unconscionable because they are designed to fail. Among other things, the MCA Agreements are designed to result in a default in the event that the merchant's business suffers any downturn in sales by (1) forcing the merchant to wait until the end

of the month before entitling it to invoke the reconciliation provision, (2) preventing the merchant from obtaining other financing, (3) and requiring the merchant to continuously represent and warrant that there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant.

42.     The MCA Agreements also contain numerous improper penalties that violate New York's strong public policy.  Among these improper penalties, the MCA Agreements (1) require the merchant to sign a confession of judgment entitling the MCA company to liquidated attorneys' fees based on a percentage of the amount owed rather than a good-faith estimate of the attorneys' fees required to file a confession of judgment, (2) accelerate the entire debt upon an Event of Default, and (3) require the merchant to turn over 100% of all of its receivables if it misses just two fixed daily payments.

**D**.     **The Intent of the Defendants is to Issue Fixed-Term Loans Using a Sham Reconciliation Provisions to Disguise the Loans.**

43.     In order to evade state usury laws, the Defendants include a sham reconciliation provision to give the appearance that the loans do not have a definite term.

44.     Under a legitimate reconciliation provision, if a merchant pays more through its fixed daily payments than it actually received in receivables, the merchant is entitled to seek the repayment of any excess money paid.  Thus, if sales decrease, so do the payments.

45.     For example, if a MCA company purchased 25% of the merchant's receivables, and the merchant generated $100,000 in receivables for the month, the most that the MCA company is entitled to keep is $25,000. Thus, if the merchant paid $40,000 through its daily payments, then the merchant is entitled to $15,000 back under the sham reconciliation provision.

46.     In order to ensure that a merchant can never use their sham reconciliation provision, however, the Enterprise falsely represents that the fixed daily payment amount is a good-faith

estimate of the percentage of receivables purchased. By doing so, the Enterprise ensures that if

sales decrease, the required fixed daily payments remain the same.

47.     For example, if 25% of a merchant's actual monthly receivables would result in a

daily payment of $1,000, the enterprise falsely states that the good-faith estimate is only $500 per

day so that if sales did in fact decrease by 50%, the merchant would not be able to invoke the

reconciliation provision.

48.     In fact, the daily payment is calculated by dividing the payback amount by the

intended duration of the loan.

49.     On information and belief, the Enterprise does not have a reconciliation department,

does not perform reconciliations, and has never refunded a merchant money as required under their

sham reconciliation provision.

**G.     The Enterprise Intentionally Disguised the True Nature of the Transactions.**

50.     Despite their documented forms, the transactions are, in economic reality, loans

that are absolutely repayable.  Among other hallmarks of a loan:

(a)     The Daily Payments were fixed and the so-called reconciliation provision was mere
subterfuge to avoid this state's usury laws.  Rather, just like any other loan, the Purchased
Amount was to be repaid within a specified time;

(b)     The default and remedy provisions purported to hold the merchants absolutely
liable for repayment of the Purchased Amount.  The loans sought to obligate the merchants
to ensure sufficient funds were maintained in the Account to make the Daily/Weekly
Payments and, after a certain number of instances of insufficient funds being maintained
in the Account, the merchants were in default and, upon default, the outstanding balance
of the Purchased Amount became immediately due and owing;

(c)     While the agreements purport to "assign" all of the merchant's future account
receivables to the Enterprise until the Purchased Amount was paid, the merchants retained
all the indicia and benefits of ownership of the account receivables including the right to
collect, possess and use the proceeds thereof.  Indeed, rather than purchasing receivables,
the Enterprise merely acquired a security interest in the merchant's accounts to secure
payment of the Purchased Amount;

(d)     The transaction was underwritten based upon an assessment of the merchant's credit worthiness; not the creditworthiness of any account debtor;

(e)     The Purchased Amount was not calculated based upon the fair market value of the merchant's future receivables, but rather was unilaterally dictated by the Enterprise based upon the interest rate it wanted to be paid.  Indeed, as part of the underwriting process, the Enterprise did not request any information concerning the merchant's account debtors upon which to make a fair market determination of their value;

(f)     The amount of the Daily Payments was determined based upon when the Enterprise wanted to be paid, and not based upon any good-faith estimate of the merchant's future account receivables;

(g)     The Enterprise assumed no risk of loss due to the merchant's failure to generate sufficient receivables because the failure to maintain sufficient funds in the Account constituted a default under the agreements;

(h)     The Enterprise assumed no risk of loss if an account debtor failed to pay an allegedly purchased receivable because the daily payments would be deducted from the next merchant that paid a merchant.

(i)     The Enterprise required that the merchants to undertake certain affirmative obligations and make certain representations and warranties that were aimed at ensuring the company would continue to operate and generate receivables and a breach of such obligations, representations and warranties constituted a default, which fully protected the Enterprise from any risk of loss resulting from the merchant's failure to generate and collect receivables.

(j)     The Enterprise required that the merchant obtain business interruption insurance and name the Enterprise as both an additional insured and a loss payee under the policy.

(k)     The Enterprise required that the merchant grant it a security interest in its receivables and other intangibles and, further that the individual owners personally guarantee the performance of the representations, warranties and covenants, which the Enterprise knew were breached from day one.

(l)     Bankruptcy was an event of default under the agreements.

(m)     The Enterprise required that the merchant's owners guarantee the representations, covenants, and warranties under the agreements and the owners guaranteed obligations were triggered upon the filing of bankruptcy.

51.     But most important is intent: New York law looks primarily to the intent of the parties in determining whether a transaction is a loan.  Here, usurious intent can be discerned from

internal negotiations, practices, and underwriting practices of the Defendants, which determine the payback based on the number of days in which the Defendants want to be paid back.  The number of days for payback has no relation to the timing of the percentage of receivables that the Defendants and the MCA Company was purporting to purchase.

52.     Instead of providing reconciliation, troubled merchants, like FTE here, are presented with the opportunity to refinance the loan into a new loan, resulting in the merchant paying interest upon interest—resulting in interest rates into the many thousands percent range.

53.     Upon information and belief, the Defendants systemically offer refinancing to address merchant cash flow in order to reap additional benefit from its high interest loans and avoid any reconciliation.

54.     The Defendants also consistently describe their products as "loans" in their direct communications with merchants and describe themselves as "lenders" and the merchants as "borrowing" funds.

55.     The Defendants also show in their underwriting practices that their agreements are loans.  Typically, banks and other institutions that purchase account receivables, perform extensive due diligence into the credit worthiness of the account debtors whose receivables they are purchasing.  When underwriting new transactions, the Defendants do not evaluate the merchants' receivables, which are the assets they are purportedly buying, but instead focus on other factors such as a merchant's credit ratings and bank balances, if they perform any due diligence at all— yet they still charge hundreds of thousands for their so-called underwriting.

56.     When the Defendants go to collect upon their agreements, they treat them just like loans.  For example, they require that the merchant make fixed daily payments under their

agreements and grant security interests to the MCA Company in substantially all of the merchant's assets to ensure that the daily payments are made.

57.     They also require that the merchants execute confessions of judgment that the MCA Company could file if the merchant fails to make as few as two daily payments under their agreements.  In other words, the Defendants structure their transactions to function just like the loans they are intended to be and not the receivable purchases they purport to be.

58.     The Defendants also engage in other unscrupulous behavior toward their merchants.  Among other things, the Defendants often fail to advance merchants the full amounts provided for in their agreements, and charge exorbitant fees for services that are never provided and costs that are never incurred.

## THE UNDERLYING FTE TRANSACTIONS

**A.      FTE Networks.**

59.     At all times material hereto, FTE Networks, together with its wholly owned subsidiaries provided innovative, technology-oriented solutions for smart platforms, network infrastructures and buildings.  The company provided end-to-end design, construction management, build and support solutions for state-of the art networks, data centers, residential, and commercial properties and services for Fortune 100/500 companies.   The company's operations were generally divided into three sections: (i) construction, (ii) telecommunication design and solutions and (iii) wireless equipment installation.  Each business section was managed by one of FTE's subsidiaries, Benchmark, Jus-Com or FTE Wireless.

60.     Benchmark was a New York based construction manager and general contractor serving a diverse client base in the telecommunications, retail, professional services, industrial, technology and financial services industries.

61.     Jus-Com provided telecommunications solutions in the wireline and wireless telecommunications industry including the design, engineering and repairing of fiber optic, copper and coaxial cable networks.

62.     Focus Wireless provided wireless solutions to major wireless carriers including equipment installation, fiber backhaul, antennae installation and testing, fiber-to-site and other turnkey solutions as needed by such clients.

**B.     Lateral**

63.     On or about October 28, 2016, Lateral, as administrative agent for the lenders, entered into a Credit Agreement (as thereafter amended, supplement and/or supplemented and together with all documents executed in connection therewith, the "Credit Agreement") with Jus-Com, FTE Networks and Benchmark as borrowers and Focus Wireless and other FTE Networks subsidiaries as guarantors (previously collectively defined as "FTE"), pursuant to which the lenders agreed to extend loans and other financial accommodations up to a maximum amount, as amended from time-to-time, which was approximately $50 million as of July 2019.

64.     FTE's obligations were secured by the grant of a security interest in substantially all of FTE's assets.

65.     Lateral properly perfected its interests in the collateral by timely making the appropriate UCC filings in the appropriate jurisdictions.

66.     In or around July 2019, FTE defaulted under the terms of the Credit Agreement, due to increasing financial stress incurred through Defendants' MCA agreements' onerous and usurious terms.  Thus, like FTE, Lateral's cash flow was materially impacted by Defendants' usurious business practices.

67.     Thereafter, Lateral declared a default and pursuant to a Surrender of Collateral and Strict Foreclosure dated as of October 10, 2019 (the "Foreclosure Agreement"), FTE agreed to surrender and turnover its interest in the collateral including, but not limited to, the claims asserted in this action.

**C.      FTE Networks and the MCA Industry**

68.     In 2018, prior to defaulting under the Credit Agreement, FTE needed additional financing.  To procure that financing, FTE turned to the merchant cash advance industry, including the Defendants, falling victim to the tactics described above.

**D.      The Loan Transactions.**

69.     FTE entered into two loan transactions with the Defendants ("Loan Transactions").

**First Loan Transaction**

70.     The first loan transaction was entered on October 16, 2018 ("**First Loan Transaction**").

71.     Specifically, FTE executed that certain agreement entitled Merchant Agreement (the "**First Loan Agreement**"), that certain agreement document entitled Guaranty  (the "**First Guaranty**"), that certain addendum entitled Appendix A – The Fee Structure (the "**First Fee Structure Addendum**"), and that certain Affidavit of Confession of Judgment ("**First Affidavit of Confession of Judgment**"), (collectively the First Loan Agreement, First Guaranty, First Fee Structure Addendum, First Confession of Judgment, the "**First Loan Documents**").

72.      On the face of the First Loan Agreement, HFH Cap was to advance $500,000, which was disguised as the "Purchase Price."

73.     The amount to be repaid was $749,500, which was disguised as the "Purchased Amount."

74.     The loan was to be repaid through fixed daily ACH withdrawals in the amount of $12,999 (a "Daily Amount"), which was disguised as a purported good-faith estimate of FTE's daily receivables. The Daily Payment was a sham and was unilaterally dictated by HFH Cap.

75.     The negotiated term of the loan was approximately 73 business days. On its face, the loan had an interest rate in excess of 249%.

76.     In addition, FTE was required to pay "$395 or 15% of the funded amount" as further consideration for making the loan, along with other fees itemized in the First Fee Structure Addendum.

**Second Loan Transaction**

77.     The second loan transaction was entered on October 30, 2018 ("**Second Loan Transaction**").

78.     Specifically, FTE executed that certain agreement entitled Merchant Agreement (the "**Second Loan Agreement**"), that certain agreement document entitled Guaranty  (the "**Second Guaranty**"), that certain addendum entitled Appendix A – The Fee Structure (the "**Second Fee Structure Addendum**"), that certain Affidavit of Confession of Judgment ("**Second Affidavit of Confession of Judgment**"), and that certain Balance Transfer Authorization Addendum ("**Balance Transfer Addendum**") (collectively the Second Loan Agreement, Second Guaranty, Second Fee Structure Addendum, Second Confession of Judgment, Balance Transfer Addendum, the "**Second Loan Documents**").

79.      On the face of the Second Loan Agreement, HFH Cap was to advance $1,000,000, which was disguised as the "Purchase Price."

80.     The amount to be repaid was $1,499,500, which was disguised as the "Purchased Amount."

81.     The loan was to be repaid through fixed daily ACH withdrawals in the amount of $21,421 (a "Daily Amount"), which was disguised as a purported good-faith estimate of 15% of FTE's daily receivables.  The Daily Payment was a sham and was unilaterally dictated by HFH Cap.

82.     The negotiated term of the loan was approximately 90 business days.  On its face, the loan had an interest rate in excess of 202 %.

83.     In addition, FTE was required to pay "$395 or 15% of the funded amount" as further consideration for making the loan, along with other fees itemized in the Second Fee Structure Addendum.

84.     On October 30, 2018, a Balance Transfer Authorization was also executed between FTE and HFH Cap.

85.     The form specifically states: "We authorize HFH CAP, to make a payment in the amount above to resolve the balance owed in connection with a previous merchant cash advance agreement dated October 15, 2018. The remaining balance of $632,509.00 will be resolved using the proceeds from the new secured agreement dated 10/30/2018."

86.     Therefore, in accordance with this balance transfer, FTE did not receive the Purchase Price of $1,000,000. Instead, the Purchase price of the Second Loan Transaction was deducted by the balance ($632,509.00) due from the prior usurious loan with HFH Cap.

87.     Plaintiff has suffered significant damages as Plaintiff was obligated to repay funds well above the amounts advanced by Defendants.

**E.      The Enterprise Operates by using a Form MCA agreement.**

88.      The Loan Transactions and the First Loan Documents and Second Loan Documents (collectively "Loan Documents") evidence a primary form template (the "HFH Cap Form") used by the Enterprise.

89.      While there are differences within a specific agreement for the loans entered into by the Enterprise, such as the date, the funding entity, and the amounts funded, these details are not material as to whether an MCA agreement is actually a loan. As highlighted below, the HFH Cap Form evidences factors that are indicative of loans.

90.      In *Lateral Recovery, LLC v. Capital Merchant Services LLC,* 21-cv-9336 (LJL) (Sept. 30, 2022), a recent decision issued by the Southern District of New York, the Court underwent a lengthy analysis in assessing similar form agreements and found that several provisions demonstrate that these "merchant cash agreements" were truly indicative of loans. *Id*. The Court noted, amongst other things, that "the essential question under New York law is whether the contracting party 'is absolutely entitled to repayment under all circumstances.'" *Id*. (citing *Fleetwood Services, LLC v. Ram Capital Funding LLC*, 2022 WL 1997207, at *9 (S.D.N.Y June 6, 2022)). Moreover, the Court explained: "Recently, Federal Courts have engaged in a more thorough and exacting scrutiny of merchant cash advance agreements, looking at the agreements in a holistic and comprehensive manner and the conclusions they have reached are compelling." *Id*.

**L.      The HFH Cap Form.**

91.      The HFH Cap Form demonstrates that the terms of the template agreement used by the Enterprise are indicative of loan terms.

92.     For example, the D/B/A's provision, Adjustments of the Specific Amount provision, the Events of Default provision, and the Protections Against Default provision, demonstrate the document was in fact intended to memorialize a loan agreement irrespective of how it is labeled, and that HFH Cap is guaranteed absolute right of repayment in all circumstances.

93.     Section 1.16 of the HFH Cap Form titled "D/B/A's" states:

> **1.16 D/B/A's.** Merchant hereby acknowledges and agrees that HFH CAP may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between HFH CAP and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

94.     This provision allows HFH Cap, and its various affiliated corporate entities such as HFH Capital and HFH Funding, to use the HFH Cap Form in its operation of the Enterprise.

95.     Section 1.4 of the HFH Cap Form titled "Seller May Request Changes to the Daily Amount" represents an illusory reconciliation provision. Specifically, the provision states:

> **1.4 Adjustments to the Specific Amount.** The Specific Amount is intended to represent the Specified Percentage of Merchant's Receipts each calendar month. At any time, HFH CAP may adjust the Specific Amount so that the amount received by HFH CAP in the future more closely represents the Specified Percentage. Also, once each calendar month Merchant may request that HFH CAP reconcile Merchant's actual receipts and adjust the Specific Amount so that the amount received by HFH CAP in the future more closely represents the Specified Percentage. Upon receipt of a written reconciliation request from Merchant, HFH CAP may request any and all information from Merchant that HFH CAP, in its sole judgment, believes is necessary to accurately reconcile the amount HFH CAP has received from Merchant with the actual Specified Percentage. HFH CAP shall not be required to adjust the Specific Amount until such time as it has received all such requested information.

96.     Notably, this provision makes clear that the merchant would need to request a reconciliation in order for the "Specific Amount" to be adjusted in the future. In the scenario where

a merchant is unable to generate or collect "receivables" to pay the Specific Amount, the reconciliation provision proves meaningless as any reconciliation would occur after-the-fact.

97.     In fact, the circumstances that would permit HFH Cap (as a lender) to call an Event of Default and to require that the merchant pay 100% of the uncollected Purchased Amount will have already taken place long before any reconciliation could take place or requested by a merchant.

98.     Thus, the reconciliation provision is illusory in practice.

99.     The Events of Default provision states:

> 3.1 **Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" hereunder: (a) Merchant or Guarantor shall violate any term or covenant in this Agreement; (b) Any representation or warranty by Merchant in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made; (c)
>
> the sending of notice of termination by Merchant; (d) the attempted ACH debit of the Specific Payment is rejected two times during the term of this Agreement, (e) Merchant shall transfer or sell all or substantially all of its assets; (f) Merchant shall make or send notice of any intended bulk sale or transfer by Merchant; (g) Merchant shall use multiple depository accounts without the prior written consent of HFH CAP (h) Merchant shall change its depositing account without the prior written consent of HFH CAP; or (i) Merchant refuses to provide HFH CAP with bank login information, whether directly from Merchant or through a Third-Party authorized by Merchant; or
> G) Merchant shall default under any of the terms, covenants and conditions of any other agreement with HFH CAP.

100.    This provision demonstrates that if a merchant fails to make the Daily Amount payment twice, the merchant is considered in default. Therefore, irrespective of the merchant's ability to pay the Daily Amount, it would still be liable to HFH Cap to repay the full Purchased Amount.

101.    The Protections Against Default provision states:

**Protection 1.** The full uncollected Purchased Amount plus all fees (including reasonable attorney's fees) due under this Agreement and the attached Security Agreement become due and payable in full immediately.

**Protection 2.** HFH CAP may enforce the provisions of the Personal Guaranty of Performance against the Guarantor(s).

**Protection 3.** Merchant hereby authorizes HFH CAP to execute in the name of the Merchant a Confession of Judgment in favor of HFH CAP in the amount of Purchased Amount stated in the Agreement. Upon an Event of Default, HFH CAP may enter that Confession of Judgment as a Judgment with the Clerk of any Court and execute thereon.

**Protection 4.** HFH CAP may enforce its security interest in the Collateral.

**Protection 5.** The entire Purchased Amount and all fees (including reasonable attorney's fees) shall become immediately payable to HFH CAP from Merchant.

**Protection 6.** HFH CAP may proceed to protect and enforce its rights and remedies by law suit. In any such lawsuit, if HFH CAP recovers a Judgment against Merchant, Merchant shall be liable for all of HFH CAP's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs.

**Protection 7.** This Agreement shall be deemed Merchant's Assignment of Merchant's Lease of Merchant's business premises to HFH CAP. Upon breach of any provision in this Agreement, HFH CAP may exercise its rights under this Assignment of Lease without prior Notice to Merchant.

**Protection 8.** HFH CAP may debit Merchant's depository accounts wherever situated by means of ACH debit or Facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to HFH CAP.

102.     As demonstrated above, in the scenario where a merchant fails to make the Daily Amount just twice, it is considered in default and therefore the Protections Against Default provision would further accelerate the full Purchased Amount due and owing, so that HFH Cap can be made whole. Specifically, the Protections Against Default provision states that "The full uncollected Purchased Amount plus all fees (including reasonable attorneys' fees) due under this Agreement and the attached Security Agreement become due and payable in full immediately."

103.     Similarly, if there are two or more ACH transactions attempted that are rejected by the merchant's bank in any given calendar month (irrespective if the Daily Amount can be paid), the merchant is held to be in default and HFH Cap is entitled to full payment under the acceleration clause of the Protections Against Default provision.

104.    The Protections Against Default provision evidences that HFH Cap (as a lender) is made whole and is entitled to repayment under all circumstances if any Daily Amount payment is missed or unable to be made by the merchant. There is no transfer of risk.

105.    Stated differently, irrespective of any event of default, HFH Cap (as a lender) would be entitled to absolute repayment.

106.    The effect of the aforementioned provisions is to further confirm that the HFH Cap Form is a template agreement that evidences a loan.

107.    The provisions as a whole in the HFH Cap Form eliminate any risk on the part of HFH Cap and gives it full and absolute repayment rights.

108.    The label placed on the HFH Cap Form that it is an "Merchant Agreement" is simply an illusory label.

109.    The provisions confirm that a merchant is obligated to pay a fixed amount on a daily basis. And if it fails to do so, just twice, it is considered in default and HFH Cap (as a lender) has access to all rights and remedies in the HFH Cap Form agreement.

## FIRST CAUSE OF ACTION
### (RICO:  18 U.S.C. § 1962)

110.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

**A.    The Unlawful Activity.**

111.    More than a dozen states, including New York, place limits on the amount of interest that can be charged in connection with providing a loan.

112.    In 1965, the Legislature of New York commissioned an investigation into the illegal practice of loansharking, which, prior to 1965, was not illegal with respect to businesses.

113.    As recognized by the New York Court of Appeals in *Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 589 (1981), the Report by the New York State Commission on

22

Investigation entitled An Investigation of the Loan-Shark Racket brought to the attention of the Governor and the public the need for change in both, as well as for change in the immunity statute, and for provisions making criminal the possession of loan-shark records and increasing the grade of assault with respect to the 'roughing up tactics' used by usurious lenders to enforce payment."

114.    As a result of this Report, a bill was proposed to allow corporations to interpose the defense of usury in actions to collect principal or interest on loans given at interest greater than twenty-five percent per annum.

115.    This measure was deemed vital in curbing the loan-shark racket as a complement to the basic proposal creating the crime of criminal usury.

116.    As noted above, loan-sharks with full knowledge of the prior law, made it a policy to loan to corporations.

117.    The investigation also disclosed that individual borrowers were required to incorporate before being granted a usurious loan.

118.    Like here, this was a purely artificial device used by the loanshark to evade the law—an evasion that the Legislature sought to prevent.

119.    Among other things, the Report recognized that "it would be most inappropriate to permit a usurer to recover on a loan for which he could be prosecuted."

120.    Defendants issue usurious loans under the guise of an MCA agreement to borrowers facing financial duress and who lack sophistication of experienced borrowers and have little familiarity with the MCA industry.

121.    While these MCA agreements purport to be a purchase of identifiable receivables, their terms actually involve Defendants' purchase of "Merchant's future accounts, contract rights

and other obligations arising from or to the payment of monies form Merchant's customers' and/or other third party payors…"

122.   While the MCA agreements purport to allow for reconciliation, their actual terms reveal this to be illusory as borrowers are limited to one (1) reconciliation request per calendar month, and since the loan here had a payment term of less than one month, there is no actual promise to reconcile.

123.   Defendants structure the MCA agreements to ensure absolute repayment through the aforementioned sham reconciliation provision, which leaves the loan's term definite as a matter of mathematics, and forcing the borrower's principals to personally guaranty the Merchant's entire obligations in the even the Merchant

**B.     Culpable Person.**

124.   Wasserman is classified as a "person" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that he is either an individual, corporation or limited liability company capable of holding a legal interest in property.

125.   At all relevant times, Wasserman was, and is, a person that exists separate and distinct from the Enterprise, described below.

126.   Wasserman is a member, manager, and authorized representative of HFH Capital and HFH Funding, both d/b/a HFH Cap.

127.   During the relevant time period, Wasserman controlled transactions within the Enterprise and was an authorized representative of HFH Capital and HFH Funding, both d/b/a HFH Cap.

128.    Through his operation of HFH Capital and HFH Funding, d/b/a HFH Cap, the RICO Person solicits, underwrites, funds, services and collects upon lawful debt incurred by small businesses in states that do not have usury laws.

**C.    The Enterprise.**

129.    HFH Capital, HFH Funding, Wasserman, and the John and Jane Doe Investors constitute an Enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

130.    HFH Capital, HFH Funding, Wasserman, and the John and Jane Doe Investors are associated-in-fact and through relations of ownerships for the common purpose of carrying on an ongoing unlawful enterprise.  Specifically, the Enterprise has a common goal of soliciting, funding, servicing and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states.

131.    Since at least 2017 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States.

132.    Over this period the Enterprise individual members would assume various trade names to do business under. This was intentionally done as part of the Enterprise's hierarchy to ensure that corporate members of the Enterprise were as insulated as possible from liability under the usurious agreements by creating plausible deniability as each specific member's liability and obligations under each specific agreement.

133.    Indeed, through the use of various alter-ego identities for the individual members of the Enterprise, Defendants intend to confuse borrowers as to which entity to contact and stall borrowers' efforts to get a full accounting of how the Enterprise is automatically withdrawing monies from borrowers' accounts.

134.    Upon information and belief, the Enterprise's use of alter-ego names for its members was orchestrated by Wasserman, as the common thread between all these members and their alter-egos is that they were ultimately controlled and for the benefit of the Defendants.

135.    The debt, including such debt evidenced by the Agreements, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because (i) it violates applicable criminal usury statutes and (ii) the rates are more than twice the legal rate permitted under New York Penal Law §190.40.

136.    Since at least 2017 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of collecting upon fraudulent fees through electronic wires.

137.    The Enterprise's conduct further constitutes "fraud by wire" within the meaning of 18 U.S.C. 1343, which is "racketeering activity" as defined by 18 U.S.C. 1961(1). Its repeated and continuous use of such conduct to participate in the affairs of the Enterprise constitutions a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

### D.    The Roles of the RICO Person in Operating the Enterprise, and the roles of the individual companies within the Enterprise.

138.    The RICO Person, Wasserman, has organized himself and the Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as

a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts including as follows:

    **i.**    **Israel Wasserman.**

139.    Wasserman is responsible for the day-to-day operations of the Enterprise, primarily through the assumed d/b/a name HFH Cap, and has final say on all financial decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.

140.    In his capacity as a member of the Enterprise, Wasserman is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form Affidavits of Confession used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations.  All such forms were used to make and collect upon the unlawful loans including, without limitation, loans extended to FTE.

141.    Wasserman has also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

142.    Wasserman has ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to others within the Enterprise.

### ii.     HFH Capital.

143.    HFH Capital is a separate legal entity that has a legal existence separate and apart from the other members of the Enterprise and maintains its own books and records.

144.    Through its assumed names, HFH Capital participates in and furthers the interests of the Enterprise by (i) entering into contracts with brokers to solicit borrowers for the Enterprise's usurious loans and participation agreements with Investors to fund the usurious loans; (ii) pooling the funds of Investors in order to fund each usurious loan; (iii) underwritten the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iv) entering into the so-called merchant agreements on behalf of the Enterprise; (v) servicing the usurious loans; (vi) setting up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (v) obtaining judgments in its assumed names to further collect upon the unlawful debt.

145.    In this case, HFH Capital, d/b/a HFH Cap, through Wasserman, knowingly and intentionally: (i) solicited borrowers; (ii) pooled funds from Investors to fund the agreements; (iii) underwrote the agreements; (iv) entered into the agreements; and (v) collected upon the unlawful debt evidenced by the agreements by effecting wire transfers from the bank accounts of Plaintiffs.

### iii.    HFH Funding.

146.    HFH Funding is a separate legal entity that has a legal existence separate and apart from the other members of the Enterprise and maintains its own books and records.

147.    Through its assumed names and d/b/a name HFH Cap, HFH Funding participates in and furthers the interests of the Enterprise by (i) entering into contracts with brokers to solicit borrowers for the Enterprise's usurious loans and participation agreements with Investors to fund the usurious loans; (ii) pooling the funds of Investors in order to fund each usurious loan; (iii)

underwritten the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iv) entering into the so-called merchant agreements on behalf of the Enterprise; (v) servicing the usurious loans; (vi) setting up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (v) obtaining judgments in its assumed names to further collect upon the unlawful debt.

148.    In this case, HFH Funding d/b/a HFH Cap, through Wasserman, knowingly and intentionally: (i) solicited borrowers; (ii) pooled funds from Investors to fund the agreements; (iii) underwrote the agreements; (iv) entered into the agreements; and (v) collected upon the unlawful debt evidenced by the agreements by effecting wire transfers from the bank accounts of Plaintiffs.

**iv.    The John and Jane Doe Investors**

149.    The John and Jane Doe Investors (the "Investors") are a group of individual investors who maintain separate officers, books, records, and bank accounts independent of the Enterprise members.

150.    Directly and through their members, agent officers, and/or employees, the Investors have been and continue to be responsible for providing the Enterprise with all or a portion of the pooled funds necessary to fund the usurious loans, including the agreements, and to approve and ratify the Enterprise's efforts to collect upon the unlawful debts by, among other things, approving early payoff terms, settlement agreements and other financial arrangements with borrowers to collect upon the unlawful debt.

151.    The Investors ultimately benefit from the Enterprise's unlawful activity when the proceeds of collecting upon the unlawful debts are funneled to the Investors according to their level of participation in the usurious loans.

### E.      Interstate Commerce

152.      The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

153.      Specifically, members of the Enterprise maintain offices in New York and use personnel in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to entities in Florida, including FTE, and throughout the United States via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

154.      In the present case, all communications between the members of the Enterprise, FTE were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications. Specifically, the Enterprise used interstate emails to originate, underwrite, service and collect upon the MCA Agreement, fund the advances under the agreements and collect the Daily Payments via interstate electronic ACH debits.

155.      In addition, at the direction of Defendants, the MCA Agreement was executed in Florida, and original copies of the agreement and the applicable Confession Affidavits were sent from Florida to the Enterprise, through Defendants, at their offices in New York via Federal Express using labels prepared by Defendants.

### F.      Injury and Causation.

156.      Plaintiffs have and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial, but no less than $1,381,509, the amount of the unlawful debt collected by the Enterprise form FTE.

157.      The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to,

millions of dollars in improperly collected criminally usurious loan payments and the unlawful entry and enforcement of judgments.

158.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

159.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from Defendants.

## SECOND CAUSE OF ACTION
### (Conspiracy under 18 U.S.C. § 1962(d))

160.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

161.    Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

162.    By and through each of the Defendants' business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among the Defendants concerning the underwriting, funding, servicing and collection of the unlawful loans, including the Agreements, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role.  Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

163.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to collect upon unlawful debts, including the Agreements, in violation of 18 U.S.C. § 1962(c).  In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the

Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the Agreements.

164.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

165.    The participation and agreement of each of Defendant was necessary to allow the commission of this scheme.

166.    Plaintiffs have been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at the hearing, but no less than $1,381,509.

167.    The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, millions of dollars in improperly collected loan payments.

168.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

169.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendants as follows:

a) Declaring the Plaintiffs' agreements with Defendants to be usurious loans in violation of New York Penal Law §190.40 and thus void and unenforceable;

29998951v.1

b) Against Defendants on account of the First Cause of Action, in an amount to be determined at trial but no event less than $1,381,509, plus treble damages and attorneys' fees;

c) Against and the Defendants on the Second Cause of Action in an amount to be determined at trial but no event less than $1,381,509, plus treble damages and attorneys' fees;

d) Any further relief deemed appropriate by the Court.

Dated:  December 9, 2022

**WHITE AND WILLIAMS LLP**

By: _____

Shane R. Heskin
7 Times Square, Suite 2900
New York, NY 10036-6524
(215) 864-6329
heskins@whiteandwilliams.com
*Attorney for Plaintiff*

33